

U.S. Department of Justice

United States Attorney
Eastern District of New York

NMA/LKG/KDE
F. #2017R00242

271 Cadman Plaza East
Brooklyn, New York 11201

January 29, 2018

By Hand and ECF

The Honorable Allyne R. Ross
United States District Judge
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. John J. Gotti
                 Criminal Docket No. 17-127 (ARR)

Dear Judge Ross:

      The government respectfully submits this letter in anticipation of sentencing in the above-captioned case. For the reasons set forth below, the government respectfully submits that a sentence within the advisory Guidelines range of 60-71 months' imprisonment should be imposed in this case, half of which should run consecutive to the defendant's current state sentences.

## BACKGROUND

I.    Facts

      On June 27, 2017, the defendant pleaded guilty to Count Two of the above-referenced indictment, charging arson, in violation of 18 U.S.C. § 844(i), relating to the burning of a civilian's vehicle. See Pre-Sentence Investigation Report ¶ 1. In his plea agreement, the defendant stipulated that he committed the April 18, 2012 robbery of Maspeth Federal Savings and Loan Association, as charged in Count Four of the indictment. The facts of both of these crimes are set forth below.

      A.    Arson of a Civilian's Vehicle

      On April 1, 2012, an innocent civilian victim (identified in the PSR as John Doe) was involved in a road rage incident with co-defendant Vincent Asaro, who was then a soldier in the Bonanno family. See PSR ¶ 4. Toll records reveal that the next day, Asaro contacted an associate of the Gambino organized crime family of La Cosa Nostra, who was able to procure John Doe's address through a local law enforcement database. See id. ¶ 5.

On April 3, 2012, Asaro met with a then-Bonanno family associate at Tuscany Deli ("CW-1"), directed CW-1 to burn John Doe's car, and pointed the car out to CW-1. See id.

CW-1 in turn recruited the defendant and co-defendant Matthew Rullan to help CW-1 burn John Doe's car. See PSR ¶ 6. In the early morning hours of April 4, 2012, the defendant, Rullan and CW-1 drove in the defendant's Jaguar to a gas station, where CW-1 filled a Gatorade bottle with gasoline. See id. The defendant then drove them to John Doe's car on Cross Bay Boulevard, where CW-1 poured the gasoline on the hood of John Doe's car while Rullan lit the car on fire. See id.

At that exact moment, CW-1 noticed a police officer in a car across the street and he and Rullan ran back to the defendant's car. See id. ¶ 7. Rather than surrender to the police, the defendant led the officer on a high-speed chase up Cross Bay Boulevard, through the Howard Beach neighborhood and into Ozone Park. See id. During the chase, the police officer radioed in the call but, after following the car at extremely fast speeds for approximately 5 to 10 minutes, he stopped pursuit as it had become too dangerous in the residential neighborhoods. See id.

For John Doe, the arson of his car was a continuation of the nightmarish car chase he had been caught up in days earlier. He immediately linked the arson of his car with the road rage incident and felt fearful for his safety. In sum and substance, John Doe believed that based upon the timing and circumstances of the rage incident and the arson, he had angered individuals associated with organized crime and the arson was retribution for the road incident days earlier. Images of John Doe's car after the arson provide ample justification for his fear. See Exhibit A (photographs of John Doe's burned car).

    B.    <u>Maspeth Bank Robbery</u>

Two weeks after the arson, the defendant, Rullan and co-defendant Michael Guidici robbed Maspeth Federal Savings and Loan Association in Queens, New York. See PSR ¶ 12. To effectuate the robbery, the defendant recruited his girlfriend, who was a teller at the bank and had access to important information regarding its operation (the "Teller"), to participate in the crime. See id. On the day of the robbery, April 18, 2012, the defendant, with Rullan and Guidici, drove to the bank. See id. Guidici then entered wearing a hat, coat and gloves and approached the Teller. See id. ¶ 13. Guidici presented the Teller with a demand note that read, in part, "I HAVE A BOMB." See id. After the Teller's supervisor saw the note, the Teller placed $5,941 on the counter, which Guidici grabbed. See id. Guidici then left the bank and ran to the car where the defendant and Rullan were waiting, and the three left the scene.

II.    <u>Applicable Law</u>

In <u>Gall v. United States</u>, 552 U.S. 38 (2007), the Supreme Court set forth the procedure that sentencing courts must follow in light of <u>United States v. Booker</u>, 543 U.S. 220, 258-60 (2005):

2

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted). Next, a district court must "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [a district court] may not presume that the Guidelines range is reasonable. [A district court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

Section 3553(a) directs the sentencing court to consider the following factors, among others, when imposing a particular sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant.

III.   Guidelines Analysis

The government submits that the following United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") calculation, as set forth in the PSR, should be applied here:

Arson (Count Two)
    Base Offense Level (§ 2K1.4(a)(2))          20
    Adjusted Offense Level:                     20

Bank Robbery (§ 1B1.2(c))
    Base Offense Level (§ 2B3.1(a))                            20
    Property of a Financial Institution Taken (§ 2B3.1(b)(1))  +2
    Threat of Death (§ 2B3.1(b)(2)(F))                         +2
    Adjusted Offense Level:                                    24

Grouping Analysis (§§ 3D1.1-3D1.4):

|              | Level | Units |
|--------------|-------|-------|
| Arson        | 20    | 1     |
| Bank Robbery | 24    | 1     |

Levels Added to Highest Adjusted Offense Level:   2

Total Adjusted Offense Level                     26

| | |
|---|---:|
| Timely Acceptance of Responsibility (§ 3E1.1) | -3 |
| Total Offense Level | 23 |

Because the defendant is in Criminal History Category III, the Guidelines range is 57 to 71 months' imprisonment. Because the defendant faces a minimum sentence of five years' imprisonment on Count Two, however, see 18 U.S.C. § 844(i), the effective Guidelines range is 60 to 71 months' imprisonment. See U.S.S.G. § 5G1.1(c)(2). In the defendant's plea agreement, the government agreed to recommend that half of the sentence imposed on the instant case run concurrent to the state sentences the defendant is presently serving (eight years' imprisonment) for his prior narcotics convictions.

IV.   Section 3553(a) Factors Weigh in Favor of a Guidelines Sentence

Section 3553(a) directs the sentencing court to consider the following factors, among others, when imposing a particular sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant.

A.   Nature and Circumstances of the Offenses

The defendant stands before Your Honor having admitted his participation in two violent felonies that harmed innocent victims in this District.

In the first, the defendant, along with co-defendant Matthew Rullan, burned an innocent civilian's car at the request of CW-1. The defendant had never met John Doe and had no reason to do him any harm. Nor had CW-1 offered to pay the defendant for his assistance in burning the car. Rather, the defendant agreed to burn a car solely out of allegiance to CW-1, who was known to be a violent La Cosa Nostra associate. As the photographs of John Doe's torched car demonstrate, the defendant's actions destroyed an innocent victim's property, terrorizing him and threating the safety of others.

But the defendant did not stop after the arson. When caught in the act, he chose to lead a police officer on a long, dangerous high-speed chase through multiple residential neighborhoods, threatening the safety of even more innocent civilians. It was only because the police officer decided that the defendant's conduct made the situation too dangerous that the defendant and his co-conspirators were able to escape.

Just two weeks later, the defendant participated in another violent crime that affected innocent civilians. This time, the defendant, with the aid of his girlfriend and two co-defendants, robbed a local bank. Co-defendant Guidici entered the bank with a demand note threatening to blow up the building, which another teller observed. Although the

defendant and his co-conspirators only made off with just over $5,000, this crime demonstrates the defendant's brazenness and disregard for the well-being of others.

Such circumstances reveal that the nature and circumstances of the offense warrant a Guidelines sentence. This is true even though the defendant is presently serving a sentence for completely unrelated offenses. The defendant's current crimes involve different conduct and different victims and therefore require additional punishment, half of which should be imposed consecutive to the defendant's current sentence.

B.   History and Characteristics of the Defendant

The same is true with respect to the history and characteristics of the defendant. See 18 U.S.C. § 3553(a)(1). This case marks the defendant's fourth serious criminal case. In December 2010 (prior to the instant offenses), the defendant was sentenced as a youthful offender to a conditional discharge in Queens County Criminal Court for Criminal Possession of a Weapon in the Fourth Degree – Intent to Use. See PSR ¶ 49. In March 2017, the defendant was sentenced to a eight years' imprisonment on two separate cases: (1) Criminal Possession of a Controlled Substance in the Third Degree (stemming from a traffic stop in June 2016 in which NYPD officers found a large quantify of narcotics); and (2) Conspiracy and Criminal Sale of a Controlled Substance in the Second Degree (stemming from a long-term investigation into the defendant's sale of large quantities of oxycodone and other drugs). See id. ¶¶ 49-50.

The defendant has now admitted his participation in two additional felonies, both violent crimes. This history reveals that for nearly all of the defendant's adult life, he has been involved in serious criminal activity including drug dealing, arson, criminal possession of a weapon and bank robbery. Accordingly, this factor also strongly weighs in favor of a Guidelines sentence.

C.   Other Section 3553 Factors

Finally, the remaining factors the Court must consider under Section 3553(a) also reveal that a significant custodial term of imprisonment—half of which should run consecutive to his current state sentence—should be imposed. For instance, a Guidelines sentence is warranted to send a message to the community that multiple violent felonies that endanger the safety of innocent civilians will be strongly punished. See 18 U.S.C. § 3553(a)(2)(B) (stating that the Court must consider the need "to afford adequate deterrence to criminal conduct"). Additional incarceration is also necessary to specifically deter this defendant from future crimes. See id. § 3553(a)(2)(C) (stating that the Court must consider the need "to protect the public from further crimes of the defendant"). The defendant's extensive criminal history at a young age—including committing the instant offenses and the narcotics crimes after being prosecuted for unlawful possession of a weapon—demonstrate the need for specific deterrence. That he committed the arson at the request of a La Cosa Nostra associate also reveals that he is willing to commit crimes not just for personal gain or

to support a drug addiction but also to ingratiate himself with a violent criminal enterprise. For all of these reasons, a Guidelines sentence is appropriate in this case.

###    D.    The Defendant's Argument Is Unavailing

Without addressing the Guidelines or the Section 3553(a) factors, the defendant requests that the Court reach an "appropriate and just sentence, considering that due to the unfortunate nature of the Federal charges, now Mr. Gotti will max out on his state case and serve in essence a much harsher sentence because he is not eligible for certain programs." (Def.'s Ltr. at 2.) The defendant repeatedly states that because of the crimes in this case, which occurred prior to his narcotics offenses, he will have to serve all eight years on his state cases and that this warrants mitigation. (See id. at 1-4.)

To the contrary, the fact that the defendant had previously committed two crimes of violence—arson and bank robbery—prior to possessing narcotics with intent to sell does not mean that the sentence imposed for the state offenses is inappropriate. Indeed, the defendant complains of the fact that at the time of his state guilty pleas, he was (but is no longer) eligible for certain time-reducing programs because he had only been convicted of a "non-violent felony." (Def.'s Ltr. at 1.) But he was, in fact, a violent criminal, as the current federal case demonstrates. The complaint that he no longer gets the benefit of certain programs because he was proven to have committed two violent felonies rings hollow.

So too do the defendant's repeated references to his addiction to oxycodone, which the defendant states drove him to sell the drugs as well. (See Def.'s Ltr. at 1-4.) As the defendant admits, at the time of the arson and the bank robbery he was only using alcohol and marijuana and only thereafter began abusing narcotic pain killers. (See id. at 3.) Although the defendant was young at the time of the federal offenses,[1] this alone does not mitigate the serious nature of the crimes.

---

[1] The defendant states that he was prepared to be moved to a New York state prison to serve the remainder of his sentence when he was arrested on the federal charges "literally weeks away from preclusion by statute for criminal activity." (Def.'s Ltr. at 2.) The defendant fails to explain, however, how the statute of limitations affects the Court's calculus under Section 3553(a).

V.     Conclusion

        For the reasons set forth above, the government respectfully submits that the defendant be sentenced to a term of incarceration within the advisory Guidelines range of 60-71 months, half of which should run consecutive to the defendant's current state sentences.

                                        Respectfully submitted,

                                        RICHARD P. DONOGHUE
                                        United States Attorney

                               By:        /s/
                                        Nicole M. Argentieri
                                        Lindsay K. Gerdes
                                        Keith D. Edelman
                                        Assistant U.S. Attorney
                                        (718) 254-7000


cc:     Defense counsel (by ECF and Email)
        Clerk of Court (by Email)